**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHERYL KHERER, individually, on behalf of the Giant Eagle, Inc. Employee Savings Plan, and on behalf of all others similarly situated,

       Plaintiff,

v.

GIANT EAGLE, INC., INVESTMENT and ADMINISTRATIVE COMMITTEE of the Giant Eagle, Inc. Employee Savings Plan, JOHN DOES 1-30 in their capacities as members of the Investment or Administrative Committees,

       Defendants.

**CIVIL ACTION NO:**

**CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

Plaintiff Cheryl Kherer ("Plaintiff"), individually, on behalf of the Giant Eagle, Inc. Employee Savings Plan (the "Plan")[1], and as a representative of the Class of participants and beneficiaries described below, by and through her attorneys, states and alleges as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA") against the fiduciaries of the Plan for

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

breaching their duties under ERISA to the participants and beneficiaries of the Plan (collectively, "participants") during the Class Period.[2]

2.      As set forth below, the Defendant fiduciaries have wasted millions of dollars of the participants' money and must be held accountable for the substantial losses suffered by the Plan and its participants.

3.      Prior to filing suit, pursuant to ERISA §104(b), Plaintiff requested copies of the Defendants' quarterly monitoring reviews and reports, and additional documents, including recordkeeping contracts in effect pertaining to the operation of the Plan, but Giant Eagle, Inc. specifically refused to provide any of the contracts, as well as many other requested documents and asserted that such documents have no role in the operation of the Plan. Accordingly, as this litigation proceeds, and particularly in regard to any Rule 12(b) motions or other defenses raised by Defendants, this Court should preclude Defendants from attempting to rely upon any such contracts and documents or the information contained therein.

## II.      BACKGROUND

4.      Defined contribution plans, which are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.*, 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner by which the employees bear the risk of high fees and investment under-performance.

---

[2] The Class Period, as will be discussed in more detail below, commences six (6) years back from the date of the filing of this Complaint through the date of judgment.

5.      Most employees contributing to 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Accordingly, it is imperative that plan fiduciaries act prudently at all times to ensure that plan participants do not suffer losses due to inappropriate investment options being provided by the plan or monies in the plan being wasted on unreasonable fees and expenses.

6.      Employees who participate in 401(k) plans are limited to investing their hard-earned wages in the investment options made available under the plan. The monies invested in the plan belong to the employees. Accordingly, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers who sponsor 401(k) plans and the fiduciaries who manage and oversee the plans.

7.      At all relevant times, Defendants were fiduciaries to the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

8.      As fiduciaries, Defendants were obligated to act prudently and for the exclusive benefit of participants of the Plan. These fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (*en banc*).

9.      Employers, as sponsors and fiduciaries of plans, are permitted to designate additional fiduciaries to manage and control the plan, including reviewing and determining which investment options will be made available to plan participants.

10.      Under ERISA, fiduciaries with the power to appoint other fiduciaries have the concomitant fiduciary duty to monitor and supervise their appointees.

11.      ERISA adheres to the principles of trust law with respect to the management and operation of 401(k) plans. Accordingly, at all relevant times, Defendants were obligated to comply with the Restatement (Third) of Trusts ("Restatement").

3

12.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (en banc) ("*Tibble II*"), (quoting Restatement (Third) of Trusts, § 90, cmt. b).

13.    Pennsylvania, and nearly every other state, has adopted the Uniform Prudent Investor Act (the "UPIA"). The Restatement also has adopted the UPIA. The UPIA codifies the Prudent Investor Rule, which serves as a standard of conduct for financial fiduciaries.

14.    Wasting the trust's (Plan's) money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7.

15.    The Department of Labor ("DOL") administers and enforces the provisions of ERISA. The DOL has instructed: "Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries." *See* U.S. Dep't of Labor, "A Look at 401(k) Plan Fees", (Aug. 2013), at 2.[3]

16.    Among other things, the DOL advises employees that their employers have "a specific obligation to consider the fees and expenses paid by [their] plan" because the "fees and expenses paid by [their] plan may substantially reduce the growth in [their] account which will reduce [their] retirement income." *Id*.  The DOL further instructs that "employers must: [e]stablish a prudent process for selecting investment options and service providers; [and] [e]nsure that fees paid to service providers and other plan expenses are reasonable." *Id*.

---

[3] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited Aug. 21, 2024).

17.    In addition, employers and other retirement plan fiduciaries must "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (expressly reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

18.    Prudent and impartial plan sponsors and other fiduciaries must monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigate alternatives in the marketplace, to ensure that well-performing, low-cost investment options are being made available to plan participants at all times and that no plan assets are being wasted on unnecessary and/or unreasonable fees and expenses.

19.    "Beneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

20.    As set forth herein, during the Class Period, Defendants have breached the duties they owed to the Plaintiff, the Plan and all of the Plan's participants.

21.    Among other things, the Defendants: (1) failed to control the Plan's administrative and recordkeeping costs; and (2) otherwise wasted the assets of the Plan and failed to act in the best interests of the Plan's participants.

22.    Defendants' acts and omissions in managing the Plan constitute a breach of their fiduciary duties in violation of 29 U.S.C. § 1104.

23.     Defendants' actions were contrary to the actions of a reasonable fiduciary and resulted in the Plan and its participants losing many millions of dollars.

24.    Plaintiff brings this action to obtain relief under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches described below, and to obtain other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. U.S.C. § 1102(a)(3).

### III.    JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

26.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA permits nationwide service of process.

27.    Venue is proper in this judicial district pursuant to ERISA § 502(e), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### IV.    THE PLAN

28.    The Plan is a Single Employer 401(k) plan which filed its most recent 5500 in October 2023.  At that time, the Plan reported $658,761,062 in assets and 8,260 total participants with account balances.

29.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401.

## V.    THE PARTIES

### A.  PLAINTIFF

30.     Plaintiff Cheryl Kherer resides in Pennsylvania. At times relevant hereto, Plaintiff was an employee of the Company and/or a participant in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

31.     As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Plaintiff and the other Plan participants have been subjected to excessive costs and fees, and, as such, have suffered financial losses.

32.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and has suffered losses due to Defendants' failure to comply with their obligations under ERISA.

33.     Plaintiff did not have knowledge of the material facts giving rise to her claims prior to her participation in this lawsuit.

### B.  DEFENDANTS

34.     Defendant, Giant Eagle, Inc. ("Company"), was Plaintiff's employer and is the sponsor of the Plan.

35.     Defendant Company is a Pennsylvania corporation with headquarters and a principal place of business in Pittsburgh, PA.

36.     At all relevant times, the Company was the Plan's administrator under ERISA § 3(16), 29 U.S.C. § 1002(16), a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A),

and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), exercising discretionary authority and control over the management of the Plan and management and disposition of Plan assets.

37.     Defendant Company, acting through its Board of Directors, directly controlled and managed the operation and administration of the Plan and/or appointed the Investment and/or Administrative Committees of the Giant Eagle, Inc. Employee Savings Plan ("Committee") to control and manage the operation and the administration of the Plan in compliance with ERISA and the Investment Policy Statement governing the Plan. Company and the Committee had a concomitant fiduciary duty to prudently select, monitor and supervise any fiduciary appointees/delegates.

38.     Defendant "Does" are the individuals on the Board of Directors and Committees during the Relevant Time Period.  The identities of the "Does" are unknown at this time and are named as "John Does" until the "Does" are known and can be named through an amendment to this Complaint.

39.     At all relevant times, Defendants Does 1-30, as members of the Board of Directors and/or Committee, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiff reserves the right to amend the Complaint to name each of these John Does once Plaintiff ascertains their identities in discovery. The Committee and John Does 1-30 will be referred to collectively as the "Committee".

40.     Although not a defendant, Principal Life Insurance Company ("Principal") was selected and/or retained throughout the Class Period as the Plan recordkeeper to provide recordkeeping and administrative services ("RKA" services).

## VI.    STANDING

41.     ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole"). Generally, a plaintiff has the standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA Plan in which the plaintiff participates. See *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 256, 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008) (recognizing that § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries").

42.     Claims under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), are brought in a representative capacity on behalf of the Plan. As explained in detail within this complaint, the Plan suffered millions of dollars in losses traceable to Defendants' fiduciary breaches and remains exposed to harm and continued future losses.

43.     As of December 31, 2022, the Plan was reported to have 8,260 participants with account balances and $658,761,062 in assets.

44.    During the Class Period, Plaintiff was a participant in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Therefore, Plaintiff has statutory standing to bring claims under ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2), (3).

45.    Plaintiff also has constitutional standing under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) because Plaintiff personally suffered concrete and particularized injuries in many ways, including, but not limited to, the Defendants failing to monitor and control recordkeeping and administrative expenses.

46.    Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

## VII.    TIMELINESS

47.    Under ERISA § 413, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation."

48.    Plaintiff Kherer has participated in the Plan since prior to the start of the Class Period through January 2024.

## VIII.    DEFINITIONS AND ERISA PROVISIONS

49.    ERISA defines a "fiduciary" as a person (1) who exercises discretionary authority or control respecting management of the plan or management or disposition of plan assets; (2) who renders or has the authority or responsibility to render investment advice for compensation regarding money or property of the plan; or (3) who has discretionary authority or responsibility in the administration of the plan. 29 U.S.C. 1002(21)(A). The term "party in interest" includes, inter alia, any fiduciary, counsel, or employee of a plan; a person providing services to the plan;

10

an employer or employee organization any of whose employees or members are covered by the plan; a corporation or other entity that is owned by such a person; an employee, officer, or director of, or owner of a specified financial interest in, such a person; and a partner or joint venturer of such a person. 29 U.S.C. 1002(14).  Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted; [s]ubsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised.

50.    An ERISA fiduciary also has a duty of prudence, which requires that the fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id*. § 1104(a)(1)(B).

51.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), also imposes a prudent person standard by which to measure fiduciaries' investment decisions and disposition of assets. The prudent person standard in ERISA requires a continuing duty to monitor Plan service providers and remove imprudent ones.  Such duty exists separate and apart from the fiduciary's duty to exercise prudence in selecting investments and service providers.

52.    These fiduciary duties are the highest known to the law.

53.    The legal construction of an ERISA fiduciary's duties is derived from the common law of trusts. Therefore, in determining the contours of an ERISA fiduciary's duty, this Court should look to the law of trusts.

54.    ERISA recognizes co-fiduciaries and related liability. ERISA § 405(a), 29 U.S.C. § 1105(a), titled "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of

fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1)[, 29 U.S.C. § 1104(a)(1),] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

55.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other equitable relief.

56.    Wasting the trust's money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7.

## IX.    FACTUAL ALLEGATIONS

## A. DEFENDANTS    PAID    UNREASONABLE    AND    UNNECESSARY RECORDKEEPING AND ADMINSITRATIVE FEES.

57.    During the Class Period, the Plan's recordkeeper, Principal, charged the Plan direct and indirect fees that were excessive relative to the type and quality of the services received by the Plan when benchmarked against other similar-sized plans for similar recordkeeping and administrative services. Here, the Plan fiduciaries failed to regularly monitor the revenue paid to Principal to ensure that the compensation received was and remained reasonable in view of the

services provided. The excessive fees incurred by the Plan resulted in lower net returns, eating into and substantially reducing Plaintiff's and Plan participants' retirement savings.

58.     Although Giant Eagle, Inc. specifically and repeatedly refused in response to Plaintiff's ERISA §104(b) requests to produce the recordkeeping agreement(s) between Principal and Giant Eagle, Inc., evidence of the Plan's imprudence can be derived from data obtained using Defendant's Plan Form 5500s provided by the United States Department of Labor. Based on the Defendants' Form 5500 data, the Plan's average recordkeeping costs were $88.31 per year per participant from 2018 through 2022. This cost to participants greatly exceeds comparable size plans with similar number of participants providing the same or similar service, as demonstrated using data below.

59.     The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[4]

60.     In addition to the excessive cost per participant, Defendants breached their fiduciary duty of prudence by selecting and/or retaining the same recordkeeper and paying excessive recordkeeping costs year after year, demonstrating a flawed process in the selection, monitoring and retention of the recordkeeper. Using the same Form 5500 data, the annual recordkeeping costs on a per participant were:  2018: $99.55, 2019: $79.83, 2020: $88.05, 2021: $88.80, and 2022: $85.30. This data reflects a flawed process in selecting, monitoring and retaining a recordkeeper and failing to timely and properly benchmark fees and solicit formal bids

---

[4] Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

("Requests for Proposal") to continuously lower costs. Based on this flawed process, the Plan and participants paid unreasonable and unnecessary amounts to third parties.

61.    Defendants have a duty to prudently select and monitor covered service providers ("CSPs"), such as recordkeepers. Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states that services must be necessary for the Plan's operation and the expenses reasonable.

62.    Every defined contribution plan must pay for recordkeeping services, which tend to be a largely automated service that can easily be provided at a relatively low fixed cost per participant in a qualified retirement plan. Which is to say, the cost of recordkeeping for an individual plan participant is, and should be, a relatively flat cost that is unrelated to the value of an individual plan participant's assets in the plan. Unfortunately, as is the case here, if retirement plan fiduciaries do not have a prudent process in place to monitor and control recordkeeping expenses, the charges passed on to a plan and its participants can be excessive and cause a substantial wasting of participants' hard-earned savings.

63.    The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is for upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

64.    In fact, over the last few decades, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased, with large recordkeepers

14

viewing recordkeeping and administration as an opportunity to generate additional revenue through proprietary investment management, managed accounts, IRA rollovers and cross-selling retail financial products. Here, the recordkeeper, Principal, benefited monetarily not just from serving as the Plan's recordkeeper, but also from receiving investment fees in products like the "Principal Stable Value Fund" that was in the Plan and held tens of millions of dollars of Plan assets throughout the Class Period.

65.     Throughout the Class Period, Defendants have shielded from participants the true and total amounts being paid by participants and the Plan for recordkeeping. Upon information and belief, Defendants have done this by, *inter alia*,  entering into complicated and hidden compensation agreements with service providers and other third parties that impose inflated fees on certain investments as part of complex revenue schemes that are neither fair nor adequately disclosed to participants, and which are disguised even in the Plan Form 5500s filed by the Plan fiduciaries.

66.     Based on Form 5500 filings, the chart below compares average recordkeeping costs from 2018-2022 paid by comparable plans with a similar number of participants to those in the Plan, and/or similar amounts of plan assets, receiving comparable services, with the average costs paid by the Plan. The Plan has substantially overpaid for its RKA services throughout the Class Period.

| Sponsor | Recordkeeper | Avg Total Plan Assets | Avg Participants: With Balance at Year End | Avg Recordkeeping Fees Per Participant | Avg Total Recordkeeper Fees Per Year |
|---------|-------------|----------------------|-------------------------------------------|----------------------------------------|--------------------------------------|
| American Woodmark Corporation | Newport Group | $251,585,400 | 7,890 | $37 | $297,625 |

| | | | | | |
|---|---|---|---|---|---|
| Edward-Elmhurst Healthcare Retirement Plan | Fidelity | $869,130,906 | 10,891 | $35 | $378,506 |
| Children's Medical Center of Dallas 403(b) Employee Savings Plan | Fidelity | $400,902,967 | 10,024 | $35 | $351,476 |
| Sutter Health Retirement Income Plan | Fidelity | $168,726,173 | 6,415 | $24 | $157,856 |
| PVH Corp. | Great-West / Milliman / Empower | $735,906,979 | 12,162 | $34 | $416,786 |
| Hannaford Bros. | Fidelity | $812,961,061 | 12,991 | $31 | $401,833 |
| Virtua Health | Lincoln National Corporation | $729,197,180 | 13,276 | $27 | $355,358 |
| Bausch Health Companies | Fidelity | $933,058,123 | 7,282 | $38 | $222,559 |
| Carlisle, LLC Employee Incentive Plan | Wells Fargo / Principal | $726,409,515 | 10,242 | $51 | $540,375 |
| **GIANT EAGLE, INC.** | **PRINCIPAL** | **$639,388,066** | **8,388** | **$88.31** | **$735,815** |

67.     Retirement plan recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

68.     The package of recordkeeping services the Plan received included basic, standard recordkeeping services such as: government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

69.     Each year, Defendants reported, via Form 5500 reports for the Plan, the total cost of its recordkeeping fees. The Plan's total recordkeeping costs, and cost per plan participant are summarized in the chart below.

| Year | Number of Participants with Active Balances | Total RKA Compensation | Recordkeeping Fee (Per Participant) | Total Assets |
|------|---------------------------------------------|------------------------|-------------------------------------|--------------|
| 2018 | 6,920 | 688,863 | 99.55 | 475,002,390 |
| 2019 | 9,366 | 747,709 | 79.83 | 588,828,862 |
| 2020 | 8,925 | 785,836 | 88.05 | 691,434,458 |
| 2021 | 8,469 | 752,011 | 88.80 | 782,913,559 |
| 2022 | 8,260 | 704,658 | 85.30 | 658,761,062 |

70.     Thus, as demonstrated above, the Plan's fiduciaries imprudently permitted the Plan to pay recordkeeping costs to Principal that were *two or more times* the amount charged to similarly situated plans, on a per-participant basis.

71.     The Plan did not receive any unique services or at a level of quality that would warrant fees greater than the competitive fees that would be offered by other providers.

72.     There are numerous recordkeepers in the marketplace (including Fidelity, Newport, Group, Voya, TIAA, and others) who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal and be able to perform the same recordkeeping functions for the Plan as Principal but at a substantially lower price. Indeed, even Principal can supply the same services to the Plan at a much lower price per participant (as confirmed by the table above), but Defendants failed to negotiate a lower price.

73.    The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like Defendant's with large numbers of participants and large amounts of assets.

74.    To ensure that a plan is paying reasonable recordkeeping and administrative fees, a prudent fiduciary solicits competitive bids from other recordkeepers to perform the same services currently provided by the plan. Upon information and belief, the Defendants failed to continually benchmark their RKA fees and failed to timely issue formal Requests for Proposals ("RFPs") to solicit lower price bids for the Plan's recordkeeping and administrative services. It is well recognized that RFPs result in lower costs being incurred for recordkeeping and administrative services, and should be conducted every 3-5 years and/or when there are substantial changes to the Plan, including the size of the Plan and the number of participants.

75.    In addition to failing to engage in the RFP process, Defendants further failed to take adequate, or any, action to properly monitor, evaluate or reduce their excessive service provider fees, such as monitoring recordkeeping costs to compare with the costs being charged for similar sized plans in the marketplace.

76.    When compared to plans with similar size, participants and services, the data (as demonstrated in the charts above) indicates a flawed process in monitoring the Plan recordkeeper to ensure excessive fees were not paid by participants.

77.    As a result of Defendants' imprudent manner of obtaining the necessary recordkeeping services for the Plan, and failing to monitor them during the Class Period, the Plan and the participants suffered substantial monetary losses.

## B. DEFENDANTS FAILED TO COMPLY WITH THE PLAN'S INVESTMENT POLICY STATEMENT.

78.     ERISA obligates fiduciaries to comply with all plan documents unless the documents run afoul of the fiduciaries' obligations under ERISA.

79.     An Investment Policy Statement ("IPS") is a plan document. *See* 29 CFR § 2509.2016–01(2) ("Statements of investment policy issued by a named fiduciary … would be part of the 'documents and instruments governing the plan' within the meaning of ERISA section 404(a)(1)(D).").

80.     The purpose of an IPS, among other things, is to set forth procedures, rules, factors and criteria for plan fiduciaries to consult, utilize and apply when evaluating funds offered by, or being considered as investment options in, a plan.

81.     Failing to adhere to the procedures and processes set forth in an IPS is a breach of fiduciary duty. However, merely complying with an IPS does not shield a fiduciary from liability for otherwise failing to comply with its obligations under ERISA.

82.     The IPS for the Plan expressly states that its purpose is to assist "with the selection and monitoring of the performance of the investment options offered from time-to-time under the Giant Eagle, Inc. Employee Savings Plan". IPS ("PURPOSE OF THE STATEMENT OF INVESTMENT POLICY AND OBJECTIVES" at 3).

83.     The IPS was adopted to "guide investment-related decisions with respect to the assets of the Plans[5], which are participant-directed defined contribution plans. This Policy identifies the investment goals and objectives of the Plans, sets out decision-making guidelines for the selection and retention of investments, and specifies the procedures and relevant measurement

---

[5] The Company's IPS is applicable to two plans: the Giant Eagle, Inc. Employee Savings Plan (i.e., the "Plan" at issue in this action), and the Giant Eagle, Inc. and Affiliates 401(k) Plan for Union Represented Employees, which is not directly at issue. Upon information and belief, Defendants may have improperly subsized

indices to be used in assessing ongoing investment performance, in accordance with the stated investment objectives." *Id.*

84.    The IPS provides:

**PLAN INVESTMENT PHILOSOPHY**

***General Philosophy:*** Investment options offered under the Plans shall be selected in order to:
- provide a range of investment opportunities in various asset classes, so as to allow for diversification and cover a wide risk/return spectrum;
- provide returns within reasonable and prudent levels of risk;
- provide returns comparable to returns for similar investment options; and
- **control administrative and management costs to the Plans and participants**.

IPS, p.5 (emphasis added).

85.    As evident by the excessive recordkeeping fees paid by the Plan and Plan participants, the Defendants wholly failed to implement or utilize a prudent process as prescribed by the IPS.

**X. DEFENDANTS BREACHED THEIR DUTIES**

86.    As part of their fiduciary duties under ERISA, the Defendants at all times were obligated to comply with 29 CFR § 2550.404a-1 ("Investment Duties").

87.    These Investment Duties required Defendants to "give[]appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved." 29 CFR § 2550.404a-1(b)(1)(i).

88.    Among other things, the Defendants were required to make "[a] determination … that the particular investment or investment course of action is reasonably designed … to further

the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks." *Id*. at § 2550.404a-1(b)(2)(i).

89.    Based on the facts and circumstances prevailing at the time of their conduct, the Committee's members routinely violated ERISA. They failed to adhere to the terms of the Investment Policy Statement (IPS) as well as the UPIA and the Restatement.

## XI.    CLASS ALLEGATIONS

90.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class")[6]:

> All persons, except Defendants, and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 23, 2018 through the date of judgment (the "Class Period").

91.    The members of the Class are so numerous that joinder of all members is impractical. The 2022 Form 5500 lists 8,260 total participants with account balances in the Giant Eagle, Inc. Employee Savings Plan.

92.    Plaintiff's claims are typical of the claims of the members of the Class. Like other Class Members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' failure to comply with ERISA and mismanagement of the Plan. Defendants treated Plaintiff consistent with other Class Members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class Members arise out of the same conduct, policies, and practices

---

[6] Plaintiff reserves the right to propose other or additional classes or subclasses in a motion for class certification or subsequent pleadings in this action.

of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

93.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are/were fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

    C.    Whether the Defendants are responsible for appointing other fiduciaries and failing to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of monetary relief.

94.    Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

95.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

96.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
## VIOLATION OF 29 U.S.C. § 1104(a) and 1105(a)
### (Duty of Prudence)

97.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

98.    ERISA mandates that fiduciaries act with prudence in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

99.    In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on: "whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014). *Accord Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

100.    At all relevant times, Defendants did not have adequate procedures in place to monitor the Plan's service providers and did not act in the best interests of the Plan participants.

101.    Defendants breached their fiduciary duties in multiple respects. Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping and administrative services and had a flawed process for selecting and retaining service providers.

102.    Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place

to ensure that: (a) RKA fees were regularly benchmarked and compared to the industry; (b) formal Requests for Proposal for RKA services were conducted very 3-5 years; (c) participants in the Plan were being charged appropriate and reasonable fees by the Plan's service providers; and (d) Plan expenses being paid were reasonable and necessary.

103.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered substantial losses.

104.    Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

105.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

106.    In addition, Plaintiff is entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in her Prayer for Relief.

**SECOND CAUSE OF ACTION**
**Failure to Monitor Other Fiduciaries**

107.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

108.    The Company had the authority to appoint and remove members of the Committee and other fiduciaries to the Plan.

109.    As the appointing/selecting fiduciaries, the Company had a duty to monitor its appointees and providers that it selected to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

110.    Company also had a duty to ensure that its appointees and Plan service providers it selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

111.    Company breached their fiduciary monitoring duties by, among other things:

   a.   Failing to monitor and evaluate the performance of their appointees and Plan service providers, or have a system in place for doing so, paying excessive and unreasonable recordkeeping and administrative fees, and standing idly by as the Plan and Plan participants suffered significant losses as a result of their imprudent actions and omissions and wasting of Plan assets; and

   b.   Failing to remove Committee members and service providers who were incompetent, who charged excessive fees, and/or whose performance was inadequate.

112.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered substantial losses.

**PRAYER FOR RELIEF**

113.    Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests the Court:

   a.   Certify the Class, appoint Plaintiff as class representative, and appoint undersigned counsel as Class Counsel;

   b.   Find and declare that Defendants have breached their fiduciary duties as described above;

c.  Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

d.  Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

e.  Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

f.  Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

g.  Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

h.  Impose a surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

i.  Order actual damages in the monetary amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

j.  Order equitable restitution against Defendants;

k.  Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

l.  Order the payment of interest to the extent it is allowed by law; and

m.  Grant other equitable or remedial relief as the Court deems appropriate.

Dated:  August 23, 2024

/s/ Edwin J. Kilpela, Jr.
Edwin J, Kilpela, Jr., Esq.
Paige T. Noah, Esq.
**WADE KILPELA SLADE LLP**
6425 Living Place
Suite 200
Pittsburgh, PA 15206
Telephone: (412) 314-0515
Email: ekilpela@waykayslay.com
Email: pnoah@waykayslay.com

Peter A. Muhic, Esq.
**MUHIC LAW LLC**
923 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002
Telephone: (856) 324-8252
Email: peter@muhiclaw.com

*Attorneys for Plaintiff and the Proposed Class*